NOT FOR PUBLICATION                                                    (Docket No. 7)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                                    :
GREGORY W. CALL,                       :
                                                    :
KATHLEEN CALL,                           :
                                                    :
                    Plaintiffs,              :        Civil No. 09-6561 (RBK/AMD)
                                                    :
                    v.                         :        **OPINION**
                                                    :
DANIEL A. CZAPLICKI, ESQUIRE,   :
DANIEL A. CZAPLICKI &               :
ASSOCIATES, P.C., BERNARD J.     :
AUDETTE, KEITH McGUIRE, THE     :
CREATIVE FINANCIAL GROUP,       :
NEW ENGLAND SECURITIES CORP.,  :
NEW ENGLAND FINANCIAL, NEW      :
ENGLAND LIFE INSURANCE CO.,      :
JOHN DOES 1-10, and ABC              :
CORPORATIONS 1-10,                    :
                                                    :
                    Defendants.           :
_____:

**KUGLER**, United States District Judge:

        This matter arises out of alleged legal malpractice during the formation of a business

agreement and fraud during the formation of a life insurance contract.  Presently before the Court

is the Motion to Dismiss by Defendants New England Securities Corporation, New England

Financial, New England Life Insurance Company (collectively, "New England"), and Bernard J.

Audette (Doc. No. 7).  For the reasons discussed below, the Motion is granted in part and denied

1

in part.

## I.      BACKGROUND

Plaintiffs Gregory W. Call and Kathleen Call are husband and wife.  Defendant Daniel A.

Czaplicki is an attorney licensed to practice law in the Commonwealth of Pennsylvania and the

State of Delaware.  Defendant Daniel A. Czaplicki & Associates, P.C. is a Pennsylvania

professional corporation and Mr. Czaplicki's employer.  The remaining Defendants are

interrelated.  For example, Defendant Creative Financial Group ("Creative") is a Pennsylvania

partnership engaged in the business of selling life insurance, stocks, bonds, mutual funds,

financial products, and financial services.  Bernard J. Audette was an employee and/or agent of

the Creative Financial Group, as was Keith McGuire.  In turn, Creative was the agent of

Defendant New England.  These Defendants' involvement in the present dispute is as follows.

Plaintiff Gregory Call and nonparties Brian Horne and Rex D. Mouser were shareholders

and owners of Mart, Inc., a Delaware corporation, Casie Protank, Inc., a New Jersey corporation,

and Rezultz, Inc., another New Jersey corporation.  Gregory Call was the majority

shareholder/owner of each of these entities.  In June of 2003, Call, Horne, and Mouser consulted

with Audette and Creative regarding the purchase of life insurance policies and other financial

products that would provide for three things: (1) the buy-out of their respective interests in the

three businesses upon their deaths; (2) the establishment of life insurance trusts that would have

the effect of avoiding the payment of any unnecessary taxes by their respective estates; and (3)

the establishment of a retirement plan that would allow Call, Horne, and Mouser to avoid the

payment of unnecessary taxes with their retirement savings and income.

Around the same time, Audette and Creative advised Gregory Call that there were

pending changes to the IRS Code that would eliminate certain tax shelters that were then available to Call, his business partners, and their businesses.  Audette and the Creative Financial Group further advised that to take advantage of these tax shelters, it was necessary to immediately form a Delaware limited liability partnership.  Thus, Audette and Creative referred Call to the Czaplicki Defendants for the purpose of obtaining legal advice regarding the formation and administration of these tax shelters.

Call then met with Daniel Czaplicki in June 2003.  Czaplicki advised Call that it would be necessary to prepare a shareholders' agreement and a partnership agreement to facilitate the formation and administration of the desired tax shelters.  On June 10, 2003, Call, Horne, and Mouser executed a shareholder agreement and a separate partnership agreement between Mart, Inc., Casie Protank, Inc., and Rezultz, Inc. for the formation of Oceanfront Leasing, LLP, a Delaware limited liability partnership.  At the same time that Czaplicki was representing Gregory Call with regard to the two agreements, he also represented Horne, Mouser, Casie Protank, Mart, and Rezultz, despite what Call alleges were actual adverse interests of the parties.

Gregory Call alleges that Czaplicki's legal advice and work was faulty on several fronts, including failing to prepare and perform with the requisite standard of care, failing to advise of the conflict of interest, and failing to advise that he was not licensed to practice in New Jersey. Plaintiffs claim that as a result of the Czaplicki's negligent representation, Horne was able to use the shareholders' agreement to block and/or attempt to block the sale of Casie Protank, Mart, and Rezultz, despite his being only a ten percent owner of each of those corporations.  With that power, Plaintiffs allege that Horne was able to demand a larger portion of the sales price of those entities than he would have otherwise been entitled to.  Plaintiffs further allege that because of

3

Czaplicki's faulty legal advice, Gregory Call lost the ability to utilize a tax loss carry forward in the approximate amount of $8,600,000.00.

Plaintiffs also allege that they were injured by various acts of the remaining Defendants. First, Plaintiffs allege that as part of the "Wealth Advisory Services" provided by Audette, McGuire, Creative, and New England, Gregory Call was referred to the Czaplicki Defendants. Plaintiffs allege that all Defendants were negligent in failing to, among other things, investigate Czaplicki's qualifications and credentials and failing to reveal Defendants' precise relationship with each other.  Second, Plaintiffs allege that all Defendants breached an implied oral contract between the parties whereby Defendants would fund a $4,000,000.00 life insurance policy for Plaintiffs through the investment income generated by a life insurance trust fund.  Plaintiffs allege that Defendants represented that one lump sum payment of $100,000.00 to the life insurance trust was sufficient to pay the premium payments for the life insurance policy.  Third, Plaintiffs allege that Defendants breached the implied warranty of fitness for a particular purpose by procuring a life insurance policy that failed to meet Plaintiffs' specific insurance needs. Fourth, Plaintiffs allege that Defendants violated the New Jersey Consumer Fraud Act ("NJCFA")[1] by fraudulently inducing Plaintiffs to purchase a $4,000,000.00 life insurance policy.  Fifth, Plaintiffs allege that Defendants committed common law fraud by representing to Plaintiffs that the $100,000.00 front-loaded payment would generate enough income to enable Plaintiffs to make the premium payments on the life insurance policy.  Plaintiffs also allege that Defendants used $21,409.14 of the premiums paid by another client on a separate life insurance policy to pay the premiums on Plaintiffs' life insurance policy.

---

[1] N.J. Stat. Ann. §§ 56:8-1 to 56:8-184 (West 2000).

4

On June 10, 2009, Plaintiffs filed a complaint in the Superior Court of New Jersey for Gloucester County.  Subsequently on November 4, 2009, Plaintiffs filed the First Amended Complaint, which contains seven counts: (1) legal malpractice, (2) breach of fiduciary duty, (3) negligence, (4) breach of contract, (5) breach of warranty, (6) violation of the New Jersey Consumer Fraud Act, and (7) fraud.  Only Counts One and Two are against the Czaplicki Defendants, while Counts Three through Seven are against the remaining Defendants.

All Defendants removed the civil action to this Court on December 31, 2009.  Defendants Audette and New England moved to dismiss on January 20, 2010.  All parties have now briefed the Motion and it is ripe for review.

## II.    STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an action for failure to state a claim upon which relief can be granted.  With a motion to dismiss, "'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)).  In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

In making this determination, a court must engage in a two-part analysis.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009); Fowler, 578 F.3d at 210-11.  First, the court must separate factual allegations from legal conclusions.  Iqbal, 129 S. Ct. at 1949.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

5

suffice."  Id.  Second, the court must determine whether the factual allegations are sufficient to

show that the plaintiff has a "plausible claim for relief."  Id. at 1950.  Determining plausibility is

a "context-specific task" that requires the court to "draw on its judicial experience and common

sense."  Id.  A complaint cannot survive where a court can only infer that a claim is merely

possible rather than plausible.  See id.

## III.    DISCUSSION

Defendants seek relief on several substantive fronts.  They argue that (1) Plaintiffs fail to

state a claim under the NJCFA because the Act does not apply to the sale of securities, and a

variable life insurance policy is a "security"; (2) Defendant Audette is exempt from liability

under the NJCFA because the Act does not apply to licensed insurance brokers; (3) there is no

legal support for the proposition that a plaintiff may bring a negligence action against a licensed

insurance broker for the negligent recommendation of a lawyer, and policy considerations do not

compel this court to recognize a cause of action for negligent recommendation; (4) Plaintiffs fail

to state a claim for breach of an oral contract because evidence of an oral contract is barred by the

parole evidence rule and New Jersey courts do not recognize a cause of action for breach of

contract for the negligent procurement of insurance by an insurance agent; (5) Plaintiffs fail to

state a claim for breach of warranty because a life insurance policy is not a "good" under Article

II of the Uniform Commercial Code; and (6) Plaintiffs failed to plead fraud under the common

law and the NJCFA with particularity because Plaintiffs failed to state which defendants made

fraudulent misrepresentations.

### A.    The New Jersey Consumer Fraud Act

The first issue before this Court is whether the NJCFA is capacious enough to govern the

6

sale of a variable life insurance policy.  A variable life insurance policy is comprised of both an investment component and an insurance component.  The hybrid nature of this insurance instrument gives rise to this dispute because the NJCFA governs the sale of insurance, but does not govern the sale of securities.  Defendants argue that because a variable life insurance policy is a security, and the New Jersey Supreme Court has held that the NJCFA does not cover the sale of securities, Plaintiffs fail to state a claim.  (Def. Reply Br. in Further Supp. of Their Mot. to Dismiss Pl.'s First Am. Com. 2.)  In support of this argument, Defendants offer a host of federal cases which stand for the proposition that a variable life insurance policy is a security,[2] and a ruling by the U.S. Securities and Exchange Commission ("SEC").[3]  In response, Plaintiffs argue that (1) insurance policies are "merchandise" under the NJCFA; (2) no New Jersey court has held that insurance is a security; (2) under New Jersey law insurance is not a security[4]; and 3) the plain language of the policy expressly states that the policy is an insurance contract and not a variable life insurance policy.  Additionally, Plaintiffs argue that even if the court finds that the disputed life insurance policy does not fall within the ambit of the NJCFA, Defendants provided Plaintiff with "estate planning and wealth advisory services," and these services fall within the scope of

---

[2]  Defendants point to <u>Roth v. Am. Family Mut. Ins. Co.</u>, 567 F.3d 884, 886 (7th Cir. 2009) (finding that variable universal life insurance policies are "both securities and insurance contracts") and <u>Araujo v. John Hancock Life Ins. Co.</u>, 206 F. Supp. 2d 377, 381-82 (E.D.N.Y. 2002) (holding that a variable life insurance policy "is a 'security' because it invests in mutual funds which are regulated by the SEC . . ." and because ". . . plaintiff invested his premiums in a sub-account which is registered with the SEC under the Investment Company Act of 1940."), to support their argument that a life insurance policy is a security.

[3]  Securities Act Release No. 33-5360 Fed. Sec. L. Rep. [1973 Decisions] * 4 ("[T]he Commission has determined that a variable life contract would be a security.").

[4]  In support of their position, Defendants offer the Uniform Securities Law, N.J.S.A. 49:3-49(m) (West 2005) ("[T]he term '[s]ecurity' does not include any insurance [ ] policy or annuity contract under which an insurance company promises to pay a fixed or variable number of dollars either in a lump sum or periodically for life or some other specified period.").

the NJCFA.

### 1.    Variable Life Insurance Policies Under the NJCFA

Before analyzing whether the life insurance policy at issue in this dispute is a security, it is important to note that no New Jersey court has determined whether a variable life insurance policy is a security under New Jersey law.  Thus, as the Third Circuit Court of Appeals held in Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., "[i]n the absence of an authoritative pronouncement from the state's highest court, the task of a federal tribunal is to predict how that court would rule . . . .  The policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts may also inform our analysis.  In addition, we may consult treatises, the Restatement, and the works of scholarly commentators." 652 F.2d 1165, 1167 (3d Cir. 1981) (citations omitted) overruled on other grounds by Aloe Co. v. Clark Equipment Co., 816 F.2d 110 (3d Cir. 1987).

The court's goal when interpreting a statute is to ascertain the legislature's intent.  Lee v. First Union Nat'l Bank, 971 A.2d 1054, 1059 (N.J. 2009).  The first step in this analysis is to examine "the language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen."  Id. (quoting Pizzullo v. N.J. Mfrs. Ins. Co., 952 A.2d 1077, 1084 (N.J. 2008)).  Generally, "technical terms, terms of art, and terms with existing legal meanings 'in the absence of legislative intent to the contrary, or other overriding evidence of a different meaning' are understood to have been used in accordance with those meanings."  In re Lead Paint Litig., 924 A.2d 484, 499 (2007) (quoting 2A Norman J. Singer, Sutherland Statutory Construction §§ 47:29, 47:30 (6th ed. 2000)).  When interpreting ordinary, nontechnical terms, "a court shall give the language, selected by the Legislature, its

8

plain meaning." Lee, 971 A.2d at 1059.  Importantly, the Court should "avoid a literal interpretation of individual statutory terms or provisions that would be inconsistent with the overall purpose of the statute." Id. (quoting State Farm Mut. Auto. Ins. Co. v. Licensed Beverage Ins. Exch., 679 A.2d 620, 622 (N.J. 2007)).  When statutory language is unclear, or amenable to more than one interpretation, "the court will look to other sources to determine the Legislature's intent." Id.

> The NJCFA provides in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . ."

N.J. Stat. Ann. § 56:8-2 (West 2002) (emphasis added).

In 1960, the New Jersey legislature enacted the NJCFA to "'eliminat[e] sharp practices and dealings in the marketing of merchandise and real estate.'" Lee, 971 A.2d at 1058 (quoting Channel Cos. v. Britton, 400 A.2d 1221 (N.J. Super. Ct. App. Div. 1979)).  In order to effectuate its purpose, the Act provides "a remedy for any consumer who has suffered an 'ascertainable loss of moneys or property, real or personal, as a result of [a CFA violation],' including treble damages, costs, and attorneys fees." Id.  Importantly, New Jersey courts have construed the statute "liberally, in favor of consumers." Cox. v. Sears Roebuck & Co., 647 A.2d 454, 461 (1994).  Furthermore, the "scope of the CFA's proscriptions are both wide and deep," and New Jersey courts have applied its provisions in "varied and eclectic" contexts. Real v. Radir Wheels,

Inc., 969 A.2d 1069, 1076 (N.J. 2009).  However, despite its broad reach, the NJCFA is

inapplicable in contexts where "a conflict would exists if the CFA were to apply to a particular

practice."  Id. at 1076 (quoting Lemelledo v. Beneficial Mgmt. Corp. of Am., 696 A.2d 546, 552-

53 (1997).

      Put simply, Defendants argue that because a variable life insurance policy is a security

under federal law, it is also a security under New Jersey law, and therefore exempt from the

NJCFA.  (Def. Reply Br. in Further Supp. of Their Mot. To Dismiss Pl. First. Am. Compl. 2.)  In

response, Plaintiffs offer the definition of a "security" provided by the New Jersey Uniform

Securities Law, which provides that the term "'[s]ecurity' does not include any insurance or

endowment policy or annuity contract under which an insurance company promises to pay a

fixed or variable number of dollars either in lump sum or periodically for life or some other

specified period."  N.J. Stat. Ann. § 49:3-49(m) (West 2005) (emphasis added).

      Defendants rely on Lee v. First Union National Bank, to support their argument that "the

CFA was not meant to reach the sale of securities . . . ."  971 A.2d 1054, 1061 (N.J. 2009).  In

Lee, the Court reasoned that the statute did not govern the sale of securities because the

legislative history revealed that the terms "real estate" and "securities" were initially included in

the statute, but the Legislature later removed the terms, and subsequently reinserted "real estate"

into the statute.  Id. at 1060-61.  The Court concluded that this intentional omission demonstrated

that the Legislature intended to exclude "securities" from the reach of the statute.  Id. at 1060.

Defendants also offer a ruling from the SEC, which provides that "the Commission has

determined that a variable life contract [is] a security."  (Def.'s Reply Br. in Further Supp. of

Their Mot. to Dismiss Pl.'s First Am. Compl. 2) (citing Securities Act Release No. 33-5360 Fed.

Sec. L. Rep. [1973 Decisions] *4).  Finally, Defendants rely upon a variety of federal cases

which stand for the same proposition.  See id. at 3 (citing Bazzone v. Nationwide Mut., 123 Fed.

Appx. 503 (3rd Cir. 2005)); Herndon v. Equitable Variable Life Ins. Co., 325 F.3d 1252, 1255

(11th Cir. 2003) (per curiam); Brashears v. 1717 Capital Mgmt., 2004 U.S. Dist. LEXIS 28400

(D. Del. May 21, 2004); Araujo v. John Hancock Life Ins. Co., 206 F. Supp. 2d 377, 381-82

(E.D.N.Y. 2002); In re Lutheran Bd. Variable Ins. Prod. Co. Sales, 105 F. Supp. 2d 1037, 1040

(D. Minn. 2000); Lasley v. New England Variable Life Ins. Co., 126 F. Supp. 2d 1236, 1239

(N.D. Cal. 1999).

 Defendants reliance upon Lee is misplaced.  Although Lee stands for the proposition that

the NJCFA does not apply to "securities" generally, there is no indication that the Court intended

to exclude an instrument consisting of both a life insurance component and an investment

component from the NJCFA.  Hence, Lee is easily distinguishable from this case because the

defendants in Lee sold the plaintiff a traditional mutual fund and not a variable life insurance

policy.

 Defendants' attempt to apply the SEC's definition of a variable life insurance policy to

the NJCFA's definition of "security" is also unpersuasive for the following reasons.  First, while

Defendants offer ample support for their argument that a variable life insurance policy is a

security under federal law, Defendants offer no legal support for the argument that designating

an insurance policy as a "security" under federal securities law necessarily precludes regulation

of the same policy as an insurance contract under state law.  Plaintiffs do not deny that a variable

life insurance policy is a security under federal law; rather they argue that because a variable life

insurance policy is an insurance contract under the laws of New Jersey, it is subject to the

NJCFA.  (Pl. Br. in Opp'n to Mot. to Dismiss Filed by Def. 8.)  In Sec. and Exch. Comm'n v. United Benefit Life Ins. Co., the Supreme Court separated the investment and insurance components of a variable annuity contract that contained elements of both an investment account and an insurance policy to determine whether a variable annuity constituted an "investment contract" under the Securities Act.  387 U.S. 202 (1967).  In United, the defendants sold the plaintiff a deferred annuity plan that consisted of both a investment component (the "Flexible Fund") and an insurance component.  Id. at 210.  The investment component of the plan was designed to "appeal to the purchaser not on the usual insurance basis of stability and security but on the prospect of 'growth' through sound investment management."  Id. at 211.  The Court held that the variable annuity constituted a "security" under the Securities Act and that the investment component of the contract did not "fall within the insurance exception of § 3(a) of the Securities Act."  Id. at 2010-11.  Significantly, the Court noted that the "basic difference between a contract to which some degree is insured and a contract of insurance must be recognized."  Id.  In reaching its decision, the Court bifurcated its analysis of the characteristics of a variable annuity. First, the Court described what it referred to as the "accumulation period."  During this period, the "insurer promises to serve as an investment agency and allow the policyholder to share in its investment experience."  Id. at 208.  The Court then distinguished the accumulation period from the period where the insurance company must determine "what amount of annuity payment is to be allowed for each dollar paid into the annuity fund at maturity."  Id.  The Court determined that during this period, "the insurer is acting, in a role similar to that of a savings institution, and state regulation is adjusted to this role.  The policyholder has no direct interest in the fund and the insurer has a dollar target to meet."  Id. at 207 (emphasis added).  Thus, the Court effectively

12

treated the annuity contract as an investment security during the accumulation period and an insurance product during the maturity period.

Variable life insurance policies, such as the policy in United, share many of the same characteristics as variable annuity contracts.[5]  Both contracts contain an investment account that fluctuates in value based upon the performance of securities in an account portfolio, and the performance of an account manager.  Additionally, both accounts require the insurer to pay the insured a fixed sum at the time the policy matures or when the policyholder deceases.  Furthermore, both plans shift the risk allocation between the insured and the insurer.  During the investment phase of the plan, the plan holder bears a majority of the risk that the plan will substantially decrease in value based on fluctuations in the market.  During this phase, the investor depends upon the investment experience and expertise of the investment fund manager.  By contrast, during the maturity or payout phase of the plan, the insurer bears the risk because it must pay the insured the amount of money promised under the terms of the plan.  In light of the inherent similarities between variable annuity contracts and variable life insurance policies, it is plausible that a state may bifurcate the investment and insurance components of a variable life insurance policy and subject one to the NJCFA and the other to the state or federal securities laws.  Therefore applying the framework adopted by the Supreme Court in United[6] to the facts of

---

[5] Indeed, the SEC has discussed both variable life insurance and variable annuities under the umbrella of "variable products" in the context of how their characteristics are relevant to the concerns underlying securities regulation. See generally Office of Compliance Inspections and Examination, U.S. Sec. and Exch. Comm'n & Nat'l Ass'n of Sec. Dealers, Joint SEC/NASD Report on Examination Findings Regarding Broker-Dealer Sales of Variable Insurance Products (2004).

[6] See also John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 101-104, 114 S.Ct. 517, 527-28 (1993) (applying the same analysis used in United to bifurcate a life insurance contract into an investment component and a life insurance component in order to determine "whether the fiduciary standards stated in Employee Retirement Income Security Act of 1974 (ERISA) govern an insurance company's conduct in relation to certain

this case, we will separate the insurance component of Plaintiffs life insurance contract from the investment component for the purposes of applying the NJCFA.

The federal cases Defendants use to support their definition of a "variable life insurance policy" are also distinguishable from this case.  The first set of cases Defendants cite involve parties bringing either federal causes of action with supplemental state law claims, or solely federal causes of action under the Private Securities Litigation Reform Act of 1995 ("PSLRA") or the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").  See Herndon v. Equitable Variable Life Ins. Co., 325 F.3d 1252, 1253-54 (11th Cir. 2003) (upholding the district court's decision that "a variable life insurance policy is a 'covered security' under the [SLUSA]."); In re Lutheran Bd. Variable Ins. Prod. Co. Sales, 105 F. Supp. 2d 1037, 1040 (D. Minn. 2007) (dismissing the plaintiff's state law claims in a class action suit brought under the SLUSA; Lasley v. New England Variable Life Ins. Co., 126 F. Supp. 2d 1236, 1239 (N.D. Cal. 1999) (same); Araujo v. John Hancock Life Ins. Co., 206 F. Supp. 2d 377 (E.D.N.Y. 2002) (same); and Brashears v. 1717 Capital Mgmt., 2004 WL 1196896, at 1-2 (D. Del. May 21, 2004) (adjudicating claims brought under the PSLRA).[7]  Congress enacted the SLUSA after the PSLRA specifically to prevent plaintiffs from bringing class action securities cases in state court rather than federal court, see H.R. Conf. Rep. No. 105-803, at 13 (1998) ("The purpose of this title is to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive

annuity contracts.").

[7] This Court notes that Defendants also cite Bazzone v. Nationwide Mut., 123 Fed. Appx. 503 (3d Cir. 2005), in support of their argument that the Third Circuit has recognized the SEC's determination that variable life insurance policies are securities.  However, Defendant neglects to mention that the only statement supporting Defendants' argument is a brief quote by Judge Ambro in the dissenting opinion.  The majority opinion provides no support for the proposition that a variable life insurance policy is a security under federal law.  Moreover, Defendants offer no precedential authority in the Third Circuit for this proposition.

litigation by filing suit in State, rather than in Federal court."), and the SLUSA expressly precludes plaintiffs from bringing supplemental state law claims in federal court. 15 U.S.C. § 78bb(f) ("No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party . . . ."). Because both SLUSA and PSLRA were designed specifically to prevent plaintiffs from evading federal regulation of securities by bringing claims in state court, the cases Defendants offer under SLUSA and PSLRA do not resolve a dispute concerning the proper interpretation of a state consumer fraud statute.

In the second set of cases, the federal courts were called upon to determine exclusively whether a variable life insurance policy is a "security" for the purpose of interpreting the Securities Act of 1933.[8] However, variable life insurance policies are hybrid products consisting of both insurance and investment components. Because this case implicates the insurance component of a hybrid product, the classification of a variable life insurance policy as a "security" (under federal law) does not necessarily defeat the state's ability to regulate the nonsecurity, insurance component in state court. The rationale for SEC regulation of securities is to ensure the disclosure of information about speculative investments, not mere promises to pay. See Sec. and Exch. Comm'n v. Sw. Coal & Energy Co., 624 F.2d 1312, 1318 (5th Cir. 1980) ("The federal securities laws were enacted primarily to serve two distinct goals: 1) to promote or require sufficient disclosure of information to allow those in securities markets to make intelligent investment decisions, and 2) to control fraud and manipulation in the trading of securities."); Sec. and Exch. Comm'n v. Guild Films Co., 279 F.2d 485 (2d Cir. 1960) ("The

---

[8] 15 U.S.C. § 77a-aa (West 1980).

15

Securities Act of 1933 was primarily intended to 'protect investors by requiring registration with the Commission of certain information concerning securities offered for sale.'" (quoting Gilligan, Will & Co. v. S.E.C., 267 F.2d 461, 463 (2d Cir. 1959)).  Therefore, the federal cases Defendants offer in support of their contention that variable life insurance policies are securities and therefore exempt from the NJCFA do not dictate the outcome of this dispute.

In light of the foregoing considerations, this Court will construe the term "variable life insurance policy" against the backdrop of New Jersey's strong consumer protection policies.  As the New Jersey Supreme Court stated in Cox v. Sears Roebuck & Co., "the Act should be construed liberally in favor of consumers."  647 A.2d 454, 461 (N.J. 1994).  Furthermore, the purpose of the Act is to protect consumers "by eliminating the sharp practices and dealing in the marketing of merchandise."  Channel Co., Inc. v. Britton, 400 A.2d 1221 (N.J. Super. A.D. 1979).  As the New Jersey Supreme Court noted in Lemelledo, "the CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations."  Lemelledo, 696 A.2d at 551.  Therefore, based on the plain text and purpose of the NJCFA, this Court concludes that the Act is broad enough to include the sale of the variable life insurance policy that is the subject of this dispute.  Although the Act excludes "securities," it covers "insurance policies." The type of hybrid product Defendants marketed to Plaintiffs contained elements of both an insurance contract and a security.  While state and federal securities laws protect consumers from certain practices in the marketing of securities, they do not necessarily extend to the insurance component of a variable life insurance policy.  So in the spirit of the NJCFA and to ensure that consumer protections extend to all components of a variable life insurance product, this Court

16

finds that the Act governs the variable life insurance policy Defendants sold to Plaintiffs.

## 2.     Insurance Broker Liability Under the NJCFA

After determining that a variable life insurance policy may constitute an insurance

contract under New Jersey law, this Court must decide whether a party bringing an action under

the NJCFA may bring a cause of action against an insurance broker for the sale of life insurance.

Defendants argue that Plaintiffs fail to state a claim under the NJCFA because insurance brokers

are exempt from the NJCFA under the "learned professionals exception."[9]  (Def. Brief in Supp.

of Their Mot. to Dismiss Pl. First Am. Compl. 11.)  Defendants also note, and this Court agrees,

that at the time of the transaction, Defendant Audette was a licensed life insurance agent in the

State of New Jersey and therefore not subject to the provisions of the NJCFA.  Plaintiffs allege

that Defendants argument fails because Defendant Audette was acting outside of the scope of his

employment as an insurance broker.  (Pl. Br. in Opp'n to Mot. to Dismiss Filed By Def. 11.)  In

particular, the Amended Complaint alleges that Defendant Audette was acting outside of the

scope of his license when he provided Plaintiffs with "Wealth Advisory Services." (Am. Compl.

at ¶ 53.)

In Plemmons v. Blue Chip Ins. Serv., Inc., the New Jersey Supreme Court held that

"insurance brokers are 'semi-professional[s]' who are excluded from liability under the CFA for

the services they render within the scope of their professional licenses."  904 A.2d 825, 833-34

(2006).  The allegations in the Amended Complaint belie Plaintiffs argument that Defendant

---

[9] For support, Defendants cite Macedo v. Dello Russo, 840 A.2d 238, 242 (N.J. 2004), in which the New Jersey Supreme Court stated, "[w]e therefore must assume that the Legislature approves of the consistent judicial interpretation of the CFA that has been extant for four decades.  Under that interpretation, advertisements by learned professionals in respect of the rendering of professional services are insulated from the CFA but subject to comprehensive regulation by the relevant regulatory bodies and to any common-law remedies that otherwise apply."

Audette was offering more than life insurance services.  Counts Four through Seven of the Complaint relate specifically to Defendant Audette's sale of an investment trust to fund the premiums on a life insurance policy.  Because Plaintiffs' NJCFA claims relate to Defendant Audette's work as an insurance broker, and licensed insurance brokers are exempt from the provisions of the NJCFA, Plaintiffs fail to state a claim against Defendant Audette, upon which relief may be granted.

The "learned professionals" exemption applies only to insurance brokers and not insurance companies.  Defendants do not argue that Defendant New England is a licensed insurance broker in the State of New Jersey.  Thus, the rationales for the Court's decision in Plemmons do not apply to the sale of an insurance policy by an insurance company or a merchant who is not a licensed insurance broker.  In Plemmons, the Court analogized insurance brokers to real estate brokers who are exempt from the provisions of the NJCFA because, as licensed semi-professionals, they are "subject to testing, licensing, regulations and penalties through other legislative provisions," and because "the nature of [a real estate broker's] activity is recognized as something beyond the ordinary commercial seller of goods or services-an activity beyond the pale of the [NJCFA]."  904 A.2d at 831 (quoting Neveroski v. Blair, 358 A.2d 473, 480-81 (N.J. Super. A.D. 1976)).  Furthermore, in Plemmons, the Court expressly stated that "it is clear under Lemelledo that financial institutions and insurance companies that sell insurance policies 'as goods and services that are marketed to consumers' are subject to the CFA."  Id. at 833 (citing Lemelledo, 696 A.2d at 551).  Therefore, because insurance companies and unlicensed insurance brokers are not subject to the same licensing and registration mechanisms as insurance brokers, this Court finds that Defendants' motion to dismiss based on Plaintiffs' NJCFA claims against

18

New England is denied.

### B.    Negligence

Plaintiffs also fail to state a claim for negligence.  In short, Plaintiffs allege that this Court should recognize a claim against Defendants for negligently referring Plaintiffs to Defendants Daniel Czaplicki and Czaplicki & Associates, P.C. without conducting a reasonable investigation of Defendant Czaplicki's legal credentials.  Although Plaintiffs concede that Defendant Audette had no duty to refer Plaintiffs to an attorney, they argue that once Defendants assumed the duty of referring Plaintiffs to an attorney, they assumed the concomitant duty to refer Plaintiffs to an attorney with the skills and credentials necessary to diligently conduct the representation.

In order to plead a cause of action for negligence, a plaintiff must show (1) duty; (2) breach; (3) proximate cause; and (4) damages.  Polozo v. County of Essex, 960 A.2d 375, 384 (N.J. 2008).  In order to determine whether an alleged tortfeasor is liable for negligence, this Court must first determine whether Defendants owed a duty of care to Plaintiffs.  The determination of whether a duty of care exists is "quintessentially a question of law for the court."  Highlands Ins. Co. v. Hobbs Grp, LLC, 373 F.3d 347, 351 (3d Cir. 2004).  Foreseeability and fairness are two key concepts a court should apply to determine whether a duty exists. Highlands, 373 F.3d at 352 (citing Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp, Inc., 638 A.2d 1288 (N.J. 1994)).  The concept of foreseeability "takes into account the relationship between the plaintiff and the broker, the nature of the risk and the defendant's ability and opportunity to exercise care and avert harm."  Carter Lincoln-Mercury, 638 A.2d at 1294. The element of fairness "requires a court to make a value judgment as to whether establishing a

19

broker's duty in relationship to a particular plaintiff is fair based on policy considerations and the public interest." Id.

In this case, both Plaintiffs and Defendants agree that an insurance broker has no duty to refer a client to an attorney for legal services. Furthermore, it is clear that referring legal services is outside of the scope of an insurance agent's duty to assist a client in procuring adequate insurance. However, Plaintiffs argue that because Defendant Audette offered to refer Defendant Czaplicki's legal services, he assumed a commensurate responsibility to conduct a reasonable investigation of Czaplicki's qualifications. This Court declines to accept Plaintiffs' invitation to create a duty of reasonable investigation for an insurance agent who refers a client to an attorney for the following reasons.

Applying the concepts articulated in Carter to this case, it is certainly foreseeable that a negligent recommendation on the part of Defendants would result in economic harm to Plaintiffs. The nature of this risk was certainly foreseeable and understandable by Defendant Audette before he referred Plaintiffs to Defendant Czaplicki. However, there is no evidence that Defendant Audette had the ability and opportunity to exercise reasonable care. Although Defendant Audette provided "Wealth Advisory Services," he was licensed and qualified to perform services as an insurance broker. Therefore, the foreseeability analysis does not support imposing liability for negligent representation.

This Court also finds that considerations of fairness and public policy weigh against imposing liability on insurance brokers for the negligent referral of legal services. While insurance brokers owe a duty to perform a reasonable investigation of an insurance carrier before placing an insured's policy with the carrier, Carter Lincoln-Mercury, 638 A.2d at 1297, there is

little reason to impose the same liability on insurance agents for referring clients to attorneys. Though insurance agents may understand the relevant characteristics of a competent insurance agent, there is little reason to believe that an insurance agent will know how to assess the qualifications of a competent attorney, or will conduct the research necessary to acquire this knowledge. While the Court notes that Defendant Audette also performed "Wealth Advisory Services," Plaintiffs fail to allege that wealth advisory involves the practice of law or any knowledge of the law. Furthermore, the imposition of a duty of reasonable investigation is wholly unnecessary here as Plaintiffs may bring a cause of action for breach of a fiduciary duty against Defendant Audette, or, Plaintiffs may recover directly from Defendants Daniel Czaplicki and Czaplicki & Associates, P.C.

Even assuming arguendo that this Court recognizes a legal duty to conduct a reasonable investigation, Plaintiffs fail to state a claim. Plaintiffs entire negligence claim rests on allegations that Defendant Audette (1) failed to adequately investigate Defendant Daniel Czaplicki's credentials; (2) failed to adequately investigate whether Defendant Czaplicki had an adequate amount of legal malpractice insurance; and (3) failed to disclose the nature of his precise relationship with Defendant Czaplicki and the "influence" Defendants had over Czaplicki. (First Am. Compl. 13). However, Plaintiffs fail to allege that Defendant Czaplicki's knowledge of New Jersey law (or lack thereof) caused any of Plaintiffs' losses, or that Defendant Czaplicki's lack of legal malpractice insurance caused any of Plaintiffs' losses. Thus, even if this Court recognizes a cause of action for negligent referral of an attorney by an insurance broker, Plaintiffs fail to state a claim upon which relief may be granted.

21

C.      **Breach of Contract**[10]

Plaintiffs allege that Defendants breached an implied oral contract whereby Defendants would procure a $4,000,000.00 policy, and use a front-loaded payment of $100,000.00 to create an investment trust that would earn sufficient income interest to pay the premiums on the life insurance policy.  Defendants argue that (1) Plaintiffs did not breach any term of the written life insurance policy; (2) any oral agreement between the parties is barred by the parole evidence rule; and (3) New Jersey does not recognize an oral contract for the procurement of life insurance.

In order to state a claim for breach of contract in New Jersey, a plaintiff must allege "1) a contract; 2) [] breach of that contract; 3) damages flowing therefrom; and 4) that the [plaintiff] performed its own contractual obligations."  See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002).  Unfortunately for Plaintiffs, it is well-settled that New Jersey does not recognize a breach of contract claim for the negligent procurement of life insurance.  Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp, Inc., 638 A.2d 1288, 1291 (N.J. 1994); Rider v. Lynch, 201 A.2d 561, 567 (N.J. 1964).  When a client depends upon an insurance broker to procure insurance that best suits his needs, "[t]he terms of the contract to procure the insurance, the scope of the risk and subject matter to be covered, may be found by implication."  Rider, 201 A.2d at 567.  However, "[t]he principal does not sue on a contract of insurance; he seeks recovery for the loss occasioned by the failure to procure such a

---

[10] Because Plaintiffs brought claims for breach of contract, common law fraud, and negligence, this Court notes that under New Jersey law, the economic loss doctrine bars a party from simultaneously recovering for the economic losses caused by breach of contract and common law fraud or negligence.  See Alloway v. Gen. Marine Indus., L.P., 695 A.2d 264 (N.J. 1997).  However, neither party argues that the economic loss doctrine applies to this case, and it is unnecessary for the Court to address the economic loss doctrine to resolve this dispute.

contract or such a valid contract."  Id.

In this case, the gravamen of Plaintiffs' breach of contract claim is that Defendants failed to "properly invest plaintiff[']s front-loaded premium in the amount of $100,000.00 as was originally bargained for and promised." (First Am. Compl. ¶ 78.)  Although Plaintiffs also allege that Defendants "charg[ed] excessive fees which prevented the plaintiff's Life Insurance Policy from generating sufficient income to fund the regular premiums as they became due and owing," and "misappl[ied] premiums that had been paid by Casie Protank, Inc., Mart, Inc., and/or Resultz, Inc. and appl[ied] [the premiums] toward the Life Insurance Policy purchased by the plaintiffs," the basis of Plaintiff's claim is that Defendants simply failed to generate enough income from the investment trust to pay the premiums on Plaintiff's life insurance policy.  Id.

Because New Jersey does not recognize a breach of contract claim for conduct that constitutes the negligent procurement of life insurance, and Plaintiffs fail to allege that Defendants breached any provision of the written life insurance policy, Plaintiffs fail to state a claim for breach of contract.

### D.    Breach of the Implied Warranty of Fitness for a Particular Purpose

This Court also rejects Plaintiffs' strained claim that Defendants breached the implied warranty of fitness for a particular purpose.  Plaintiffs allege that Defendants "did not form the life insurance trust that they had recommended to the plaintiffs at the time [Defendants] sold the Life Insurance Policy in question to the plaintiffs." (First Am. Compl. ¶ 88.)  Plaintiffs' also argue that Defendants failed to procure a life insurance policy that met the specific purposes they communicated to Defendants.

The implied warranty of fitness for a particular purpose applies to the sale of "goods"

23

under Article II of the Uniform Commercial Code ("U.C.C."), as adopted by New Jersey and enacted at N.J. Stat. Ann. §§ 12A:1-101 to 12-26 (2010).  The Uniform Commercial Code provides that "'[g]oods' means all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Chapter 8) and things in action.  'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (12A:2-107)."  N.J. Stat. Ann. § 12A:2-105.  No New Jersey court has decided whether an insurance contract is a "good" under the definition of "goods" provided in section 2-105 of the U.C.C.  However, nearly all jurisdictions that have construed the U.C.C. have held that the term "goods" does not include insurance contracts.[11]  In the absence of any New Jersey case law addressing this issue, this Court declines to expand the definition of "goods" under the U.C.C. by creating a new cause of action under the implied warranty of fitness for a particular purpose for insurance contracts.  Furthermore, Plaintiffs provide no authority supporting their argument that an insurance contract is a "good" under Article 2 of the U.C.C. Accordingly, this Court finds that Plaintiffs fail to state a claim for breach of an implied warranty of fitness for a particular purpose.

### E.    Common Law Fraud

Defendants challenge Plaintiffs' common law fraud claim on several fronts, but in essence argue that Plaintiffs failed to allege justifiable reliance because the life insurance contract

---

[11] See Howard v. CitiFinancial, Inc., 195 F. Supp. 2d 811, 826 (S.D. Miss. 2002); Bartley v. Nat'l Union Fire Ins. Co., 824 F. Supp. 624, 636 (N.D. Tex. 1992); Elrad v. United Life Accident Ins. Co., 624 F. Supp. 742, 744 (N.D. Ill. 1985); Klapp v. United Ins. Grp. Agency, 674 N.W.2d 736, 738 (Mich. App. 2003); Jones v. CGU Ins. Co., 78 S.W.3d 626, 629 (Tex. App. 2002); Nielsen v. United Serv. Auto. Ass'n, 612 N.E.2d 526, 531 (Ill. App. Ct. 1993). See also White & Summers, Uniform Commercial Code (2d Ed. 1980) at 6 ("The Code does not apply to the formation, performance, and enforcement of insurance contracts . . . .").

contained all of the material terms of the agreement between the parties, and, that Plaintiffs failed to plead fraud with the requisite specificity - including a precise statement of the date, time, or place of the fraud, or the allegations that apply to each defendant.  (Def. Reply Br. in Further Supp. of Their Mot. to Dismiss Pl.'s First Am. Compl. 13.)  In response, Plaintiffs allege that they have pled a claim because Defendants misrepresented that the $100,000.00 front-loaded payment would cover the cost of the insurance premiums; that Defendants used Plaintiffs' front-loaded premium for their own use and benefit and deliberately concealed the fact that they had not invested the front-loaded premium appropriately; and that Defendants misapplied $21,409.14 of the premiums paid to an insurance policy created for Mart, Inc., Casie Protank, Inc., and Rezultz, Inc. to pay Plaintiffs' life insurance policy premiums.

The elements of common law fraud are (1) a material misrepresentation of a presently existing or past fact, (2) knowledge or belief by the defendant of its falsity, (3) intent that the other party rely on it, (4) reasonable reliance by the other party, and (5) resulting damages. Triffin v. Automatic Data Processing, Inc., 926 A.2d 362, 368 (N.J. Super. Ct. App. Div. 2007). A plaintiff must plead common law fraud with particularity under Federal Rule of Civil Procedure 9(b).  Fredericko v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007).  Thus, a party claiming fraud must "plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."  Id.

A party bringing a common law fraud claim must show that their reliance on the defendant's misrepresentations was reasonable.  In re Resorts Int'l, Inc., 181 F.3d 505, 509 (3d Cir. 1999).  Reliance is unreasonable when the party to a life insurance contract relies upon statements that contradict the written policy itself.  See In re Northwestern Mut. Life Ins. Co.

25

Sales Practices Litig., 70 F. Supp. 2d 466, 486 (D.N.J. 1999) ("[T]he general rule in New Jersey

has been that an insured is under a duty to examine his insurance policies; if the terms disclosed

by such an examination are inconsistent with his desires, he is required to notify the company of

the inconsistency and of his refusal to accept the policy in the proffered condition.") (quoting

Martinez v. John Hancock Mut. Life Ins. Co., 367 A.2d 904, 909 (App. Div. 1976)).  In New

Jersey "one who sues an insurance company in fraud and deceit for the acts of its agent, and who

could have protected himself by an examination of the policy, is under an obligation to do so."

Nat'l Premium Budget Plan Corp. v. Nat'l Fire Ins. Co. of Hartford, 234 A.2d 683, 716 (N.J.

Super. Ct. Law Div. 1967), aff'd, 254 A.2d 819 (N.J. Super. Ct. App. Div. 1969).

     In this case, Plaintiffs deposited a $100,000.00 front-loaded premium from a Merrill

Lynch account into an investment fund to be used to pay the premiums on a life insurance policy.

Plaintiffs allege that Defendants represented to them that the income generated by an investment

fund bearing the front-loaded payment of $100,000.00 was sufficient to pay the premiums on a

$4,000,000.00 life insurance policy without any additional payments.  However, the express

terms of the written life insurance policy contradict Plaintiffs' interpretation of the policy.  In

particular, the agreement provides[12]:

        Planned Annual Premium
            1st Year         $100,000.00
            Year 2          $100,000.00

---

[12] The general rule is that a trial court "has discretion to address evidence outside the complaint when ruling on a motion to dismiss."  Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548 (2002).  As the Third Circuit acknowledged in Pryor, the court may consider "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading."  Id. at 560.  Furthermore, a court may also consider "[d]ocuments that the defendant attaches to the motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to the claim . . . ."  Id.  Because both parties refer to, and rely upon, the life insurance policy, and the policy is integral to the fair resolution of this dispute, this Court will examine the terms of the policy to determine whether to grant Defendants' motion to dismiss.

No Lapse Annual Premium   $30,743.77.

(Certification of B. John Pendleton, Jr., in Supp. of Def. Mot. to Dismiss Ex. B at 3.)

Furthermore, the policy provides that "[t]he values and benefits of a policy depend on: the

investment performance of the portfolios in which the SubAccounts are invested; and the interest

credited to the Fixed Account.  We do not guarantee the investment performance of the portfolios

of the SubAccounts.  You bear the investment risk for amounts invested in the SubAccounts for

your Policy."  In light of the clear language of the policy, Plaintiffs' claim that they justifiably

relied upon Defendants' representations that the investment trust would generate enough income

to pay the policy premiums, and that the $100,000.00 front-loaded premium would be sufficient

to pay the premiums on the policy, fails as a matter of law.[13]

Because Plaintiffs' claim that Defendants' alleged misrepresentation that the front-loaded

premium would cover the cost of life insurance premium payments fails as a matter of law,

Plaintiffs' only remaining fraud claims are that Defendants misappropriated Plaintiffs' front-

loaded premium "for their own personal benefit and use," and "misapplied $21,409.14 of the

premiums being paid by Casie Protank, Inc., Mart, Inc., and/or Resultz, Inc. on an entirely

separate life insurance policy . . . toward the premiums that were due . . . on the Life Insurance

---

[13]  The Court notes that Plaintiff submitted an affidavit by Plaintiff Gregory W. Call with their Brief in Opposition to
Motion to Dismiss Filed by Defendants.  The contents of Plaintiffs' affidavit suggest that Plaintiffs did not receive a
copy of the life insurance policy until after they transferred $100,000.00 from the Merrill Lynch account into the
investment trust.  Pursuant to Rule 12(b)(6), this Court will not consider the facts contained in the affidavit that are
not included in the Complaint or Amended Complaint.  As the court held in Poling v. K. Hovnanian Enter., 99 F.
Supp. 2d 502 (D.N.J. 2000), "[i]n evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court
may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly
authentic documents if the plaintiff's claims are based upon those documents."  (citing Pension Benefit Guar. Corp.
v. White Consol. Indus., 998 F.2d 1196 (3d Cir. 1993), cert. denied, 510 U.S. 1042 (1994)).  Accordingly, Plaintiff
may not insert facts that are not alleged in the Amended Complaint, by attaching an affidavit to a brief filed in
opposition to Defendants' motion to dismiss.

Policy purchased by the plaintiffs . . . . "  (Am. Compl. at ¶¶ 104, 106.)

Stripped to their bare form, the allegations in the Amended Complaint suggest that Defendants engaged in some form of unlawful conduct by transferring funds from one of Plaintiffs' accounts to their life insurance policy without providing them with proper notice, and used Plaintiffs' front-loaded premium for Defendants' own personal benefit.  However, Plaintiffs do not allege (1) that Defendants knew or had reason to know that they would use funds from the premiums paid by Casie Protank, Mart, and Rezultz on another life insurance policy to pay the premiums on Plaintiffs' life insurance policy; (2) reasonable reliance by Plaintiffs prior to signing the life insurance policy; (3) that Defendants intended to induce Plaintiffs to rely on the misrepresentation; and/or (4) damages.  Plaintiffs merely allege that Defendants misused and misappropriated funds from three companies controlled by Plaintiff Gregory Call to pay Plaintiffs' life insurance policy so that it would not lapse.  While Plaintiffs may have a cognizable claim against Defendant Audette for breach of a fiduciary duty, Plaintiffs fail to state a claim of common law fraud.  Therefore, although Plaintiffs have demonstrated that Defendants abused the privilege of their position and control over Plaintiffs' insurance needs, Plaintiffs have failed to allege a cognizable cause of action for fraud.

### F.    Fraud Under the New Jersey Consumer Fraud Act

The Court must reach the same result as to Plaintiffs' claim under the NJCFA.  To state a claim under the NJCFA, a plaintiff must show (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss.  Deutsch Bank Nat. Trust Co. v. Lacapria, No. 08-2174, 2010 WL 715617, at *5 (D.N.J. Mar. 1, 2010).  Because Plaintiffs have failed to state a claim for

fraud, they have also failed to state a claim under the NJCFA.  Cf. Int'l Minerals & Mining Corp. v. Citicorp N. Am., Inc., 736 F.Supp. 587, 599 (D.N.J. 1990) (holding that NJCFA claim failed where underlying common law fraud claim failed).  Therefore, the Court grants Defendants' Motion to Dismiss as to Plaintiffs claim of fraud under the NJCFA.


## IV.      CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss with respect to Counts Four, Five, Six, and Seven of the Amended Complaint; deny Defendants' motion to dismiss with respect to Defendant New England on Count Three; and grant Defendant Audette's motion to dismiss on Count Three.  The accompanying Order shall issue today.


Dated:  9/16/2010                               /s/ Robert B. Kugler
                                                ROBERT B. KUGLER
                                                United States District Judge